Good morning, Your Honors. My name is Chet Waldman from the law firm of Wolf-Popper LLP, and I will be speaking here today on behalf of both plaintiffs' appellates. If I can, I would like to reserve five minutes for rebuttal. Your Honors, let's say you go to your broker and you ask to buy 100 shares of the Acme Corporation, which is trading at $1 per share. You give your broker $100 plus commission. The broker buys you 50 shares and pockets the other $50. You sue. Three years later, your case is still pending. Acme shares are now trading at $4 per share. They've gone up by a multiple of four. Your 50 share investment is now worth $200. You've doubled your money. Have you been injured? Can your broker take the $50 that she was supposed to invest in additional shares for you? While defendants would say that you have no injury in fact and no damages, and that your broker could keep your $50, in fact, that's wrong. It's not the law. Tell me what evidence there is in the record that you can rely on at the summary judgment stage to show that the 1 in 4 exchange ratio was in fact improper. And I realize that there's a whole argument about whether the 56D affidavit should have been in that you didn't have information, but at that moment in time, what information did you have to defeat that finding? First argument, as you just pointed out, is there's been no discovery here. Well, there's been some discovery. You can't say there's been none. There's been no discovery here. There was 170 pages of documents, no depositions, nothing. Plaintiff Blakeslee got zero documents. So there's been no discovery. They have not complied with anything. They didn't give their initial disclosures yet. So there's been no discovery. But let me just briefly say some of the evidence that's out there. First of all, you could not have picked the worst time to value these two companies in that as this merger was happening, PHC had just acquired Meadowood, which it had announced it expected to increase its revenues by 30%, but that deal hadn't occurred. In fact, the Acadia-PHC merger was contingent on that deal occurring. That is at 8-17-10, for example. Also at the time, PHC showed a higher growth rate over its recent history than Acadia. PHC had a greater EBITDA for the three months ended March 31, 2011, than Acadia on a pro forma basis. In addition, PHC shares were publicly traded, while Acadia's were not. Acadia was a private company, which actually goes into valuation. SRR, the financial advisor that wasn't the conflicted financial advisors, had less than two weeks to value a private company that had not filled out any SEC filings since it didn't have to. Additionally, the exchange ratio grossly overvalued Acadia and undervalued PHC. For example, within a month and a half of the deal, Acadia acquired YFCS, which quadrupled its revenues. On April 1, 2011, it purchases YFCS. It bought it for 5.6 times multiple. It immediately, in this valuation, upped it by 50% and valued it at 8.5 to 9 times multiple. Can you tell me, did Judge O'Toole give a rationale when he asked that instead of the motion to dismiss motions be filed, that instead the parties file motions to summary judgment at that stage of litigation? Did he explain to you why he wanted motions to summary judgment instead of motions to dismiss? No. In fact, he was frustrated with the defendants that they had already filed three motions at the pleading and they were arguing essentially the same things on the pleading and they were arguing facts. So he just put out there, well, I guess if you turn it into a summary judgment motion as opposed to a motion to dismiss, you might bring that out. That's factual. But if that happens, plaintiffs should be given the opportunity to take a limited discovery. He said that on the record, yet he ignored our 50-60. If you want, I can continue on to say that there was multiple facts, even without discovery, which are detailed in our amended complaint that show the exchange ratio is not fair. In any event, going back to my hypothetical where you ask for 100 shares, your broker buys you 50 and pockets 50. Well, he took your $50 and you should have 100 shares worth $4 per share or $400 instead of 50 shares worth $200. That hypothetical is substantially similar to what happened here. That is because in this case, plaintiffs' appellants are challenging the merger between PHC and Acadia on two primary grounds. The first is that holders of PHC's class B shares received more consideration in connection with the merger than did holders of PHC's class A shares. Not surprisingly, the A shares are held primarily by the public and the B shares are held 93.2% by defendant Bruce Scheer. But that was voted on by an independent board of directors with Mr. Scheer abstaining, right? No. The board was not at all independent. Not in any way, shape, or form. And how do you know that? What is the one reason that the board of directors for PHC says there's justification to give more to the B shares than A shares? Let me give you that specifically, which is in a proxy on page 61A1101 in your record. It says, the board noted that the class B holders were entitled to be fairly compensated for the surrender of their control rights. The board was dominated and controlled by defendant Scheer, who elected four of the six members. In fact, the only reason that Acadia paid more to the B shares is because they would then do what Scheer tells them to do. Otherwise, it has no value going forward that the B shares could elect four of six members because the board is not going to exist after the merger. But that was the reason that they gave them more for the B shares. Now, they never tell you where do they come up from $5 million for the difference in that value. There is no fairness opinion ever that indicates why $5 million. It's picked out of a hat. In fact, it is all that Scheer did to negotiate the difference. There's no basis for it. SRR, in its fairness opinion, disclaims any fairness between the class A and class B. In fact, if you look at the proxy at page 20, which is A1060, one of the risks of the merger is how limited SRR's opinion is and that it didn't opine as between the A and the B shares. The other thing we attacked, in addition to the difference between the A and the B shares, which have no justification, is that the PHE shareholders received an unfairly small number of Acadia shares in the merger as a result of an exchange ratio that disproportionately favored Acadia shareholders over PHE shareholders. Whether Acadia shares later increased or decreased in value, class A shareholders were harmed both by receiving less consideration than the B shares and, secondly, by receiving fewer shares than was fair. Both of these harms due to the fiduciary duty breaches. In discussing plaintiff's allegation of an unequal, unfair, and disadvantageous merger-exchange ratio four decades ago, in the Schlicht v. Penn-Dixie Sub-Inc. case, which is 507F2-374 at pages 381 and 382, the Second Circuit Court of Appeals stated, and I quote, it is axiomatic that fewer shares are worth less on the open market than more shares. I see you don't have too much time left. Could you just spend a couple minutes talking to us about the acquiescence issue? Absolutely. I'll do that very quickly. Pavlidis v. New England Patriots Club is dispositive of that issue, which, by the way, was raised in a one-sentence parenthetical in the District Courts of Kenyon. That case, Pavlidis, and numerous Delaware cases, make clear that one cannot acquiesce to a merger if the shareholder voted against it or abstained from voting, or if the shareholder has been and is pursuing litigation attacking the merger, or in the context of an interest transaction where a company's controlling shareholder is receiving more than the public shareholder's, or where the merger vote is not fully and fairly informed. In this case, unquestionably, both plaintiffs voted against the merger. In this case, both plaintiffs have been and are pursuing litigation attacking the merger. In this case, this is unquestionably an interest transaction. In this case, the merger vote was not fully and fairly informed. Therefore, there is no acquiescence under the law. My last point is that a grant of summary judgment is premature prior to discovery. As this Court and others have said, only in the rarest of cases may summary judgment be granted against a party who has not been afforded the opportunity to conduct discovery. This is not one of those rarest cases because the two legal bases for the District Court's ruling were clearly erroneous, and the additional grounds raised by defendants for granting summary judgment involved disputed issues of fact. That there are numerous issues of fact as opposed to purely issues of law, which need to be fleshed out in discovery in this case, is vividly demonstrated by Defendant Apelli's brief, and I'm done, but I would like you to point out all you need to do is look at Defendant's brief at 11-12-13-14, 18-19-20-21-23-27-28-29-30-34-35-43, where they say we didn't prove our allegations or give sufficient evidence of those allegations. Thank you. May it please the Court. James Hume from the law firm of Aaron Fox, representing the Defendant Apelli's. This case arises from an arm's-length merger that, by all accounts, has been very, very good for the shareholders. It was approved by both the Class A and the Class B shareholders voting together and separately. Approximately 89% of the Class A shares that voted approved the merger. Mr. Hume, let me just ask you this. Once the district court declined to dismiss on the pleadings, why would he not allow discovery to go forward? Your Honor, there was this, I think Judge McConnell pointed out, some discovery. Very minimal. It was very minimal, although I think significantly we attached Judge Bull's discovery ruling to our brief in the supplemental affidavit, and she pointed out there that there had been initial disclosures and initial production of board meeting minutes. Yes, but there wasn't discovery in the conventional sense. There was not. There weren't depositions, interrogatories, all the things you'd expect in a substantial case. Although at that hearing, as she recites in her opinion, she tried to get the plaintiffs to tailor their discovery to say, what do you really need for this proceeding? And they declined to do so. They said it's my way or the highway, it was all or nothing. You can go back to the magistrate's report, but this is the situation we're in. We've got a Rule 56D motion, which is quite detailed and on its face quite plausible. We've got a district court that ignores it. It doesn't deny it and give reasons, which is what I would normally expect to find. It ignores the motion. So we have to reconstruct after the fact if there is some basis for not letting these plaintiffs have the discovery that plaintiffs almost always are entitled to and get in the great mine run of cases. And what in this case was such as to say, this is not the sort of case where the plaintiffs need any discovery or should be allowed any discovery? I think that I would point, Your Honor, to three cases that we've relied on, the Malpedia case, the Art Technology case, and the B.J. Wholesale Company case. In fact, I would argue an alternative grounds to affirm below is that Judge O'Toole actually made two fundamental errors in his motion to dismiss ruling, which had they been corrected, I think, should have resulted in a different result. One, he specifically found in that one. But you're ignoring Judge Sellier's question, which is, what makes this the rare case? And I think that's actually a term from Judge Sellier for a circuit opinion. What makes this the rare case where the court would approve the denial of a right to conduct at least some formal discovery? Well, why is this a rare case? What seems rare to me, I think, is what Judge Sellier mentioned is, you know, in my 30 years of practice, I have never seen such a detailed 56, we used to call it F, but now D, affidavit that was as pointed as the ones that the plaintiffs submitted. I think because the 56 affidavit was insufficient as a matter of law, in fact, this case should have been dismissed on the motion to dismiss or the motion for judgment on the pleadings, which is I think what you indicated where Judge O'Toole asked for a summary judgment motion. Because Malpedie, which I would urge the court to read that because the facts there were more egregious. That involved Frederick's of Hollywood and the effort to sell that. Knightsbridge, which was the suitor, also became the majority shareholder before the transaction was voted on by the board. And that went off on a motion to dismiss. What's different about this case now is that once the plaintiffs allowed the transaction to close, and despite their promises of filing for a preliminary injunction, they never did so. And there was nothing to prevent them from doing that. In fact, that's why Judge Boal was trying to confine discovery. Didn't they agree that they would not seek the preliminary injunction in exchange for discovery? No, no, they never did. In fact, if you read the transcript of the hearing and her discovery ruling, they said specifically that this was a hearing in late August of 2011, that they would file the motion for a preliminary injunction by, I think, September 19th. It never appeared then. They allowed the transaction to close. What that does is that then kicks in the exculpatory clause, which is very, very significant, which is what Malpedie rests on substantially. That takes care of all of the duty of care claims are now barred, whereas before they may have been allowed for injunctive purposes but no longer for damages. And it changes the scope of the case. Wait just a second. I thought the exculpatory clause, as I understand the jurisprudence, has an exception for acts that are in bad faith or which constitute intentional misconduct. It does. And how do you prove that such an exception applies in a particular case if you're not allowed discovery? Well, first you have to allege sufficient facts that demonstrates that. Well, don't go too far down that road because, as Judge McConnell said, this 56D motion was very detailed. Yes, I think it was detailed, but it was legally insufficient because the only thing you've heard the real two complaints are is that the Class B shareholders received $5 million that the Class A shareholders did not and the exchange ratio. And that the Board of Directors was conflicted. Well, that is actually insufficient as a matter of law. As I said, in Knightsbridge you had the majority shareholder who could clearly control the board, and that was not deemed to be a conflict. This was an independent board. Mr. Scheer abstained, and the board was actually perfectly aligned with the Class A shareholders. All of the board members that voted were Class A shareholders. None of them was a Class B shareholder. Mr. Scheer negotiated this deal that got him $4,800,000-some-odd-thousand of extra payment. Yes, he did. And as I said, the Class A shareholders then approved it by almost a 90 percent vote. And after full disclosure, there are no disclosure claims in this case. The plaintiffs elected not to do that. Is there anything in the record that supports the valuation of the $5 million payment in exchange for the Class B stock? Nothing empirical like that, other than the fact that under the Massachusetts Business Law, Section 10.04, when shareholders of a class are having their rights changed, they have to vote separately, so they did here. That's why a separate vote was taken, so that the Class As would have veto power over this if they did not approve it. The other thing is that the Class B shareholders did have enhanced voting rights. They voted, actually, multiple votes in shareholder votes. It wasn't one man, one vote, and they also had the right, basically, to choose four of the board members. But there was nothing that put a specific value on what that was. But that's not required under the law. There was full disclosure here as a matter of law. The plaintiffs elected, despite the invitation not to ever bring the final definitive proxy before the court to file disclosure claims after we went final. They declined to amend. They declined the court's invitation to try to tailor the discovery. But specifically, on Rule 56, I think this is an Anderson Celotex issue. Defendants said, all right, you can't prove any damage here. It was certainly well within the plaintiff's ability to put forth something, an affidavit. Mr. Shanker put an affidavit in, recites 40 years' history, and doesn't say word one about the deal. They could have come up with an expert. There was extensive financial information here on both companies provided in the proxy materials. They had enough to do something, and I think the summary judgment cases, as this court said in Dow, requires the plaintiff to at least come forward with something. The lack of discovery here wasn't preventing them from at least presenting some sort of prima facie case of injury. But none of those cases were before summary judgment being found before discovery took place. Each of those had to do with whether, I was supposed to say usually the plaintiff, but one of the parties needed further discovery or didn't do due diligence during the discovery period. I don't know of any case that I saw that you cited or the other side cited that said at the very initial stages of a case that summary judgment can enter in a fact-based case when a motion to dismiss has been denied on a number of times as a matter of law. None of those cases applied to that instance. They all talk about the plaintiff sat on their hands, it didn't act quickly enough, there was nothing more to explore, they have enough. But the legal standard to be applied as a result of the exculpatory clause, it's really just the duty of loyalty and the Delaware Supreme Court a number of times has said the legal standard there is whether the board's action was so irrational as to defy common sense. And the plaintiffs have to come up with at least some facts as to why this would defy common sense. There's simply nothing here that would even come to the duty of loyalty. So you have Malpedie, you have Art Technology, and you have D.J. Wholesale Club all being dismissed before any discovery. And we submit that's what should have happened here, and that's why the court can and should affirm the ruling below. Their position is that there's nothing in the record as to why 5 million supports common sense. Well, they don't – first of all, when you have a fully informed vote of the shareholders, which we have here, because there are, like I say, no disclosure issues, and this was fully disclosed to the shareholders, there's no issue that this $5 million was not disclosed. And by the way, there were several hundred Class B shareholders, it's not just Mr. Scheer. He did have 93% of the shares, but there were several hundred who shared in that other 7%. It shifts the burden even on the cases where it would be a total fairness evaluation, which isn't this case. Even there, when you have the fully informed vote of the shareholders, it would shift the burden of the plaintiffs to come forward with something in terms of a fact, not just allegations. And what you heard today from Mr. Walker. The way the plaintiffs come up with the facts to come forward with is through discovery. What we usually apply at the motion to dismiss stage is a standard as to whether the allegations are sufficient to state a cause of action. That question was resolved against you by the district court, and it's not before us on appeal. Well, I think I can argue that the district court erred to support the decision here, so I think it is actually before you. Yeah, you can argue that, but I wouldn't advise you to spend a lot of breath on it. And by the way, on the control point, I do want to point out that paragraph 77 of the MAS complaint specifically alleges control of the corporation is not vested in a single person, entity, or group, but versed in the fluid aggregation of unaffiliated stockholders. They specifically recognized that this was a public corporation. Judge Boland, in her decision, says that Mr. Scheer is not a controlling shareholder. That substantially changes the dynamic here and the legal standard to be applied. Simply, the plaintiffs have not come forward with anything other than the fact that the Class B shareholders receive this extra $5 million. If you look at Malpedie and our technology and BJ Wholesale, that's insufficient. And indeed, the shareholder ratification would cure that. The shareholders have approved this after disclosure of the $5 million payment. The fact that the reason for it or how it was calculated was not disclosed is not material and essential. The payment was disclosed, and 90% of the Class A shareholders said, we're okay with that. And indeed, history has now proven them right because there's been a 600% increase or more in the price of the stock since the time of the merger. But you concede that that has nothing to do with one of the major arguments, which is if the exchange ratio was inappropriate, whether they made money or lost money afterwards doesn't relate to whether they didn't get sufficient amount of stock in the new company. My point is the exculpatory provision takes the exchange ratio argument out of the case. That may have been there beforehand. But once the deal closed, those issues as to price and to fairness and all of that are gone. And indeed, even if it were in the case, the plaintiffs did not come forward with an affidavit or any evidence that the exchange ratio was inappropriate. They had substantial financial information. You had an argument here based on the financial information, but there are no facts. They didn't put an affidavit in about that with a conclusion. They could have had an expert. They could have had Mr. Shanker or something. When the defendants filed the summary judgment motion, it was sort of a, okay, show me what you have. And in response, we didn't get a single verified fact here. And you do not need discovery for that type of argument. The expert could have analyzed the information and done what Mr. Waltman has done here today in his argument. The lawyer's argument is insufficient. An expert's affidavit may have been sufficient, but there's just nothing in the record on the exchange ratio. And as I say, with the exculpatory provision in place, it narrows the case down under the case law to one where the transaction has to prove facts or allege facts that show that the transaction defies common sense, and they simply haven't done that. So we think that we ask that the decision be affirmed because this case is one that should have been dismissed. It should have been dismissed on the motion for judgment on the pleadings. And, indeed, Malpedie says we actually prefer to raise this by judgment on the pleadings rather than a motion to dismiss. Did you cross-appeal the denial of the motion to dismiss? No, I don't think we need to, Your Honor, because we can argue any grounds in support of the result that we need to without filing a cross-appeal. So I do not believe I needed to do that to bring those issues before this Court. So on the basis set forth in our brief, we ask the Court to affirm. Thank you. Your Honors, I find it quite interesting that the two cases that the appellees waive in front of this case, this Court, are Malpedie and B.J. Hossel. Let's start with Malpedie. First of all, Malpedie was overruled by a subsequent Delaware Supreme Court, that is, Emerald Partners v. Berlin, which limited Malpedie to only cases in which the business judgment rule is applied. This is an interested transaction with a controlling shareholder. Under Massachusetts law, under Gutt v. McDonough and Coggins v. New England Patriots Court, and as the Court found on its motion to dismiss opinion, this isn't a business judgment standard. It is an entire fairness standard of review. So Malpedie has no application whatsoever. But much more importantly, with Malpedie, let me quote from Malpedie, because it feeds into what your Honors have been saying all along. The Malpedie Townsend opinion itself says in discussing Levy v. Stern, which was a Delaware Supreme Court case, that, quote, before the trial court may rule on a motion for summary judgment on the substantive merits of the plaintiff's claims, plaintiffs must have a meaningful opportunity to conduct discovery on the information held by the defendants. That is 780, a second, 1075, specifically at page 1084. That is Malpedie. So on Malpedie, they lose. Now let's go to B.J. Hosell. In B.J. Hosell, you couldn't find a more different case than this. In B.J. Hosell, B.J.'s shows exactly why the defendants breached their duty of loyalty here and why the exculpatory provision cannot apply. Here, a majority of the board was appointed by the controlling shareholder, Scheer, four of the six members. There was no controlling shareholder in B.J.'s. Thus, in B.J.'s, the shareholder had no power to oust a majority of the directors, as that decision noted at page 65. Next, the board members, other than Scheer here, were all interested anyway because they had substantial non-vested options which would immediately invest, and only for them, which calculated today by today's value is over $1.3 million in value to just those five, not including Scheer. So they were substantially interested in their transaction, despite the fact that they were also dominated and controlled by Scheer by his voting four of the six. The board also never solicited, actively solicited, any interest from other bidders in this case. There was no shopping done by the company as is conceded. In B.J.'s, it was actively shopped for a lengthy time period. Also, here, there was no special committee of independent directors, i.e., the two that weren't appointed by Scheer, or anyone acting in the interest of the class A as opposed to the class B. In B.J.'s, there was an independent special committee. Also, here, in B.J.'s, the board members had appointed their own financial and legal advisors to the special committee. Again, here, there was no special committee to retain anybody. Also, the board in B.J.'s drove up the price substantially, rather than simply rubber stamping the price that Scheer did. The board never moved by a penny what Scheer had delivered to them. That would be the exchange ratio. The board also, in B.J.'s, negotiated a reverse termination fee of $175 million to protect the deal. Not here. So the process in this case was nowhere near as robust as the process in B.J.'s. As to the disclosure point that they say, there's no disclosures here, it was fully informed, that's not true. The Mazz complaint, the Amita complaint, was never dismissed. Our duty of disclosure claims are still part of the record. The Blakeslee complaint was dismissed as the disclosure claim without prejudice. And the court didn't find that any of the disclosures alleged were not material or ineffective. It merely pointed out that, as Blakeslee had admitted, was that it attacked the preliminary proxy. A final proxy had come out in the interim. Blakeslee said some of the disclosure violations had been mooted. So the court just said, I don't want to waste my time looking at some things that may have been mooted. Just eventually come back. I have about 25 seconds to go if you have any questions. I'll answer. If not, I'll step down. Thank you, Your Honor.